475 P.2d 497

Lawrence R. READER and Sally Reader, his wife, Robert Reader, a minor, by his Guardian ad Litem, Lawrence R. Reader, Appellants and Appellees,

v.

GENERAL MOTORS CORPORATION, a Delaware corporation, Appellee,

Madison Chevrolet, Inc., an Arizona corporation, Appellant and Appellee,

Hertz Corporation, a Delaware corporation, dba Hertz Rent A Car, Appellant.

No. 1 CA–CIV 1083.

Court of Appeals of Arizona,
Division 1,
Department A.

Oct. 1, 1970.

Rehearing Denied Nov. 10, 1970.
Review Granted Jan. 19, 1971.

Killian & Legg, by John G. Hough, Mesa, for the Readers.

Snell & Wilmer, by Roger W. Perry and Arthur P. Greenfield, Phoenix, for General Motors Corporation.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, by John H. Killingsworth and Jay M. Martinez, Phoenix, for Madison Chevrolet.

Fennemore, Craig, von Ammon & Udall, by Calvin H. Udall, Phoenix, for Hertz Corp.

STEVENS, Judge.

On 14 July 1965, in the course of his employment, Lawrence R. Reader was driving a heavily ladened 1965 Chevrolet truck of the 60 series down a steep grade. His minor son, Robert, was with him. The truck was approximately six months old. Before starting downgrade, Reader tested the service brakes and they were functioning satisfactorily. He shifted to a lower gear to have the advantage of engine compression to impede the downgrade progress of the truck. Compression alone would not adequately control the vehicle's speed. After he commenced his downgrade course and upon the third application of the brakes the hydraulic brake line ruptured. The truck then had no service brakes. The hand or parking brake was not adequate, nor was it intended as a substitute for service brakes. Reader attempted to slow the vehicle by further downshifting without success. Upon obtaining a speed of approximately 70 miles per hour, he gathered his son to him and jumped. Both were seriously injured. The truck went over an embankment and was extensively damaged. The record is devoid of any indication of negligence on Reader's part.

The truck had been manufactured by General Motors Corporation. It left General Motors with a conventional one seat cab and no body. Through Madison Chevrolet, a local Chevrolet dealer, the truck was sold to the Hertz Corporation. Hertz leased the truck to United Produce Company, Inc., Reader's employer. To meet United's specifications Hertz contracted with the Fruehauf Trailer Company to move the rear wheels 30 inches to the rear. A 20-foot van body with ice bunkers and a blower was installed. The truck frame was not modified other than to drill the holes necessary to affix the rear wheels in the new position. The details of the installation of the van body are not set forth in the record. The record is silent as to any work by Fruehauf in the area which is involved in this litigation.

At some time during the brief life of this vehicle, the speedometer cable was fastened to the frame of the truck by a clip. This was done in such manner as to create contact between the speedometer cable and the hydraulic brake tube. The tube thus became worn and ruptured at the place of contact. This was the cause of the accident.

Suit was filed by the Readers against General Motors, Madison Chevrolet, Rudolph Chevrolet, and Hertz. Hertz sought recovery over against Madison and General Motors. Madison sought recovery over against General Motors. Rudolph had performed some warranty repairs. Rudolph prevailed on a directed verdict at the close of the plaintiffs' case and there was no appeal from that portion of the litigation.

The trial court directed a verdict in favor of General Motors. The trial court mark-

edly limited the issues as to Madison. The jury verdicts in favor of Lawrence R. Reader and in favor of Robert were against Hertz only.

On this appeal the amounts of the verdicts are not in issue nor is there an issue as to the plaintiffs' legal right to seek damages against someone. In other words Robert's status as a passenger riding with his father and the father's status as an employee-driver for United are not issues as to their respective capacities to sue.

The basic issues which are presented to us are:

1. The propriety of the directed verdict in favor of General Motors;

2. The extent of the obligation of the dealer-seller in connection with the performance of manufacturer's warranty repairs; and

3. The nature of the Hertz liability as the lessor of the vehicle.

### ADDITIONAL FACTS

A "clip" is a metal object used to hold a wire or a cable onto or in close proximity to the frame or to a bracket attached to the frame of the truck. We are here concerned with "E clips," with clips exemplified by "Exhibit 62" and with a clamp exemplified by "Exhibit 71." We will discuss these in more detail later in this opinion.

The truck in question was equipped with a manually operated five-speed transmission. The transmission was located under the floor boards of the cab. The truck had two rear axles, only the forward of the two having a differential. The forward axle was a two-speed axle. The change of the differential gear ratio was activated by a control on the gearshift lever. The higher speed is called "over" and the lower speed for heavy upgrades or for more effective compression retardation of speed on downgrades is called "under." Reader commenced his descent in third under.

The truck was equipped with a hydraulic braking system for the service brakes. There was a hydrovac integrated with the braking system which boosted the power applied to the brake shoes when pressure was applied to the brake pedal. The tubing which carries the hydraulic fluid was affixed to the inside of the left portion of the frame. The speedometer cable was in two sections and we are concerned only with the lower or rear section. The cable was activated by the transmission. It was attached to the upper left of the transmission. There was an L-shaped bracket on the left frame. The horizontal portion was affixed to the frame. The bracket extended toward the center of the vehicle and the vertical portion was downward. There was a one-quarter inch hole in the vertical portion. The sole function of the bracket was to route the speedometer cable. The design called for the use of the E clip, one portion of which was inserted through the hole and the cable was then forced into another portion of the clip so that the spring action of the clip and the friction engendered by the clip held the cable in place. The dual function of the clip was to route the cable in a good position for its operation and to effectively prevent any contact between the speedometer cable and the brake line. E clips were a factory item not available to dealers. In the event the E clip was missing or in the event the cable became disengaged therefrom, the cable would hang in an arc and would not be in contact with the brake line. The Exhibit 71 clamp, earlier mentioned, was one of perhaps several clamps which could be used to perform the E clip function. The clamp formed a loop through which the cable could be passed and the clamp would then be bolted to the bracket utilizing the hole in the bracket. The E clip should have been inserted into this same hole.

After the accident it was discovered that sometime, someone had used an Exhibit 62 clip to hold the speedometer cable against the truck frame in such a manner as to create the cable and brake line contact. The clip was placed on the frame in close proximity to the L-shaped bracket and to the rear thereof. It was through this contact that the flexible cable rubbed against the securely fastened brake line, wearing

the brake line so thin that the heavy pressure on the brake system on the downgrade course of the truck caused the brake line to rupture at this weakened point. An Exhibit 62 clip is somewhat U shaped and is forced over the horizontal portion of the frame, being held in place by friction. There was testimony that the Exhibit 62 clip was not a Chevrolet part. There was testimony, much of which was stricken by the trial court, that Exhibit 62 or similar clips were found on the frames of other Chevrolet or GMC trucks [also manufactured by General Motors] holding electrical wires in place. There was testimony that some GMC and some Chevrolet parts are interchangeable.

After the truck left General Motors and before its delivery to Hertz it was processed through Madison's "get ready" department.

After Hertz received the vehicle, subsequent to the Fruehauf modification and subsequent to the installation of the van, it was used exclusively by United. By contract Hertz had the full responsibility for keeping the vehicle "in good repair, mechanical condition, and running order" as well as all lubrication. By contract the vehicle was garaged by Hertz and Hertz undertook the "complete inspection and necessary repairs" thereof.

A mock-up of a portion of the frame, the speedometer cable route, the L-shaped bracket and the location of a segment of the brake line was built by General Motors and was received in evidence. An excellent color photograph of the frame area in question was taken shortly after the accident and was received in evidence. From these exhibits it appears to this Court that the L-shaped bracket is rather prominent. The bracket appears to be located at approximately the forward edge of the floor boards. There was extensive evidence presented by witnesses who pointed to various areas of the mock-up. This was undoubtedly easy for the jury, the trial court, and for counsel to see and to comprehend.

The record is difficult to read without the benefit of the courtroom physical demonstrations. This Court readily appreciates the difficulty counsel experienced in establishing a solid trial record in their efforts to cause that record to completely reflect the full effect of this particular portion of the evidence.

The record reflects that the parties engaged in extensive discovery before trial. It may be that some potential areas of testimony were explored and found to be not existing. We have reviewed this case based upon the record before us.

Two days after the accident Mr. Fred H. Cady, an expert in accident analysis and accident reconstruction, examined the vehicle. He was assisted by a Madison mechanic, Mr. Donald Hartman. We do not have an estimate as to the length of time that the Exhibit 62 clip had been installed on the frame. From an examination of the colored photograph it would appear that the clip had been in place for some period of time. The jury answered an interrogatory advising that it was not able to ascertain who had placed the clip on the frame.

The manufacturer's warranty repairs under consideration were perfomed on the vehicle by Hartman as an employee of Madison. On 15 January 1965 he removed and repaired the hydrovac. To do so it was necessary for him to physically place himself underneath the truck. The exact location of his under-truck involvement is not clear from the record. It appears however to have been in close proximity to the bracket. At the time of this work the odometer reading showed 640 miles. On 16 February 1965 with an odometer reading of 6,276 miles, he removed and repaired the transmission. The transmission was again removed and repaired on 22 February 1965 at which time the odometer reading showed 7,164 miles. In the transmission work it was necessary to disconnect the speedometer cable from the rear of the transmission and it was also necessary to take up the floor boards. Hart-

man testified that it was not necessary on any of these occasions to disengage the cable from the bracket, that he was certain that he had not done so and that he had no recollection of observing the bracket or the location of the speedometer cable. He testified that had he seen the cable in the location and condition found after the accident he would have relocated the cable by attaching it to the bracket with a clamp of the Exhibit 71 type. After Cady and Hartman inspected the damaged vehicle they inspected other new 1965 trucks of the 60 series and found some with E clips and some without. There was no evidence as to the substitute, if any, which was used.

Witnesses who were employees of Madison, Fruehauf, Rudolph Chevrolet, and Hertz were called and testified. The record does not disclose who installed the Exhibit 62 clip or when it was installed.

### GENERAL MOTORS

■ Mr. Robert J. Smith, a senior research engineer with the Product Analysis Department of Research and Development, a Chevrolet Motor Division employee, was called by the plaintiffs. He testified as to the assembly line procedures. It is clear from his testimony that no clips similar to Exhibit 62 were available on the assembly line at the point of the installation of the bracket, the speedometer cable and the scheduled insertion of the E clip. There was no refutation of this testimony. Even had there been negligence on the assembly line consisting of the failure to install the E clip or to properly attach the speedometer cable therein, the result of such negligence would not have created the dangerous condition which caused the accident. General Motors could not reasonably anticipate that the failure to install an E clip would result in the installation of an Exhibit 62 clip and the rerouting of the speedometer cable in the manner in which it was found after the accident which was the cause of the accident. This is true in that such omission would more reasonably be cured by the use of a clamp similar to Exhibit 71. Although there were some questions as to

design, these did not rise to the dignity of placing the matter of design in issue.

After the plaintiffs rested, Hertz proceeded with its evidence. There was no evidence presented during that phase of the trial as to the get-ready work performed by Madison. After Hertz rested the trial court granted the General Motors motion for a directed verdict as to the claim of the plaintiffs and as to the cross-claims filed by Madison and Hertz. In our opinion if the plaintiffs were unable to establish a submissible case against General Motors, the cross-claims by Madison and Hertz fell at the same time. We affirm the judgment in favor of General Motors.

### INSTRUCTIONS

■ At the close of all of the evidence the court declined to instruct on the theory of strict liability in tort. There was an absence of sufficient direct or circumstantial evidence to permit the jury to infer that the Exhibit 62 clip was used by Madison to secure the speedometer cable to the frame during the get-ready process. The principles of Vandermark v. Ford Motor Company, 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964), are not applicable. We affirmed the foregoing ruling of the trial court.

The jury was instructed on the negligence theory only. The instructions were concise. We can best outline the theories and issues which were submitted to the jury by quoting a portion of the instructions as follows:

"Now, this is a type of action which we refer to as a negligence action because the test in this case is whether the defendants were negligent.

\*　　\*　　\*　　\*　　\*　　\*

"Negligence is the lack of ordinary care. It is the failure to exercise that degree of care which a reasonably prudent or careful person would have exercised under the same circumstances. Negligence may arise from the doing of an act which a reasonably prudent or careful person would not do under the same circum-

stances or the failure to do an act which a reasonably prudent or careful person would do under the same circumstances.

"You are instructed there is no evidence from which you can reasonably find that the defective condition on this truck in question existed at the time this truck was sold to The Hertz Corporation. Whether or not the parties here were negligent is to be determined by the conduct of all who had contact with the truck but only during the time following the delivery of the truck to Hertz.

"The sole question for your determination as to whether Madison Chevrolet was negligent is whether or not defendant Madison Chevrolet, following delivery of this truck to Hertz and in the course of making repairs thereon, negligently placed the clamp in question on the speedometer cable attaching it to the frame as found after the accident. In that regard you are instructed that when a mechanic or dealer such as the defendant Madison Chevrolet contracts to repair a defect in the truck he does not contract to inspect and repair the neighboring parts and has no duty to do so.

\*      \*      \*      \*      \*      \*

"A corporation or person who leases a motor vehicle to another has a duty to use ordinary care either to make the truck safe for its intended use or to warn those whom he should expect to use it of any defect that is not open and obvious and of which he knows. He also has the duty to exercise ordinary care to see that the vehicle is reasonably safe for its intended use and to discover defects therein.

"Where the lessor of a motor vehicle has agreed to provide for inspection of the vehicle and to maintain it in good repair, mechanical condition and working order these duties are continuing ones.

\*      \*      \*      \*      \*      \*

"The lessor of a motors (sic) vehicle is not liable for injuries resulting from any defective condition of the vehicle of which he was not aware or could not

have discovered in the exercise of ordinary care.

"The fact that the lessor of a motor vehicle entrusted it to others for repair, maintenance or alterations would not relieve the lessor of the duty to exercise ordinary care to ascertain that the vehicle was in a reasonably safe condition.

\*      \*      \*      \*      \*      \*

"If you find that the defective condition of this truck was created by Madison Chevrolet and that Hertz Corporation in the exercise of ordinary care could reasonably have discovered the condition, then both defendants would be liable.

"If you find that the defective condition was created by Madison Chevrolet and that the Hertz Corporation in the exercise of ordinary care could not reasonably have discovered the condition, then Madison Chevrolet alone would be liable.

"If you find that the defective condition was not created by Madison Chevrolet, then Madison Chevrolet would not be liable.

"If you find that The Hertz Corporation created the defective condition, then Madison Chevrolet would not be liable and the Hertz Corporation alone would be liable.

"If you find that some other person or corporation created the defective condition, or if you are unable to find who created the defective condition, and if you find that the Hertz Corporation in the exercise of ordinary care should have reasonably discovered the condition, Hertz Corporation alone would be liable.

"If you find that some other person or corporation created the defective condition, or if you are unable to find who created the defective condition, and if you find that the Hertz Corporation in the exercise of ordinary care could not have reasonably discovered the condition, neither defendant would be liable."

The record establishes that all issues as to instructions which are raised on this appeal were adequately preserved.

## HERTZ

The trial court set out the duty of a lessor of chattels in its instructions to the jury. That instruction substantially followed section 408 of the Restatement (Second) of Torts (1965), referred to in Lechuga, Inc., v. Montgomery, 12 Ariz.App. 32, 467 P.2d 256 (1970). Liability is imposed in cases of physical harm caused by a chattel if the lessor fails to exercise "reasonable care" to see that the property is fit for its intended use.

Portions of the Hertz-United contract have heretofore been quoted. The jury found negligence on the part of Hertz in failing to discover the dangerous condition. Had it been discovered there would have been a Hertz duty to correct and repair and under the circumstances of this case we hold that a mere warning would not have met the Hertz responsibilities. We affirm the judgment of the plaintiffs against Hertz.

## MADISON CHEVROLET

This portion of the case is the most difficult to resolve. We have already stated that we affirm that Madison was without liability up to the point of the delivery of the vehicle to Hertz. In the presentation of the evidence by Madison it called the get-ready mechanic who had signed the printed form of the get-ready sheet. He had no independent recollection. The form had no space to indicate the presence or absence of a proper routing of the speedometer cable.

The vehicle was sold under a General Motors warranty which we quote in part.

"* * * Chevrolet Motor Division's obligation under this warranty being limited to repairing or replacing at its option any part or parts thereof which shall, * * * be returned to an authorized Chevrolet Dealer at such Dealer's place of business and which examination shall disclose to Manufacturer's satisfaction to have been thus defective. The repair or replacement of defective parts under this warranty will be made by such dealer without charge for parts, and if made at such Dealer's place of business, without charge for labor.

"The provisions of this warranty shall not apply to any Chevrolet motor vehicle * * * which shall have been repaired or altered outside of an authorized Chevrolet dealership in any way so as, in the judgment of Manufacturer, to affect adversely its performance and reliability, * * *."

In our opinion the terms of the warranty effectively persuade the buyer that manufacturer's warranty repairs should be made by an authorized Chevrolet dealer. Had Hertz made the hydrovac and transmission repairs in its own shop or had Hertz sent the vehicle to an independent garage for these repairs then Hertz would have subjected itself to a question as to the replacement of the warranted parts and would have been required to bear the labor costs. These observations are important in our view in relation to the fact that manufacturer's warranty repairs were performed by an authorized Chevrolet dealer, in this instance the seller, Madison.

The instruction given at the request of Madison equated its responsibility in doing warranty repairs with the responsibility of an independent garageman. The Court of Appeal of Louisiana in the case of Glisson v. Colonial Buick Inc., 156 So.2d 271 (1963), is illustrative of this principle. Therein the Louisiana Court quoted with approval the trial court's observations:

"When the plaintiff brought her car to Colonal (sic) Buick on November 3, 1960, she asked that a 'rattling' noise be repaired. No specific reference was made to the control arm. Colonial Buick simply agreed to fix the 'rattling' noise and this apparently was done. The proximity of the 'left lower control arm' to the left front brakes that the Colonal (sic) Buick mechanic worked on is of no consequence in determining the liability of the defendant. When a mechanic contracts to repair a defect in an automobile

he does not impliedly contract to inspect and repair the neighboring parts."

The above case seems to be consistent with § 403 of Restatement of Torts (Second) which is as follows:

"One who as an independent contractor makes, rebuilds, or repairs a chattel for another and turns it over to the other, knowing or having reason to know that his work has made it dangerous for the use for which it is turned over, is subject to the same liability as if he supplied the chattel."

In connection with this section we note the following caveat:

"The Institute expresses no opinion that a contractor who fails to exercise reasonable care to inform his employer of a dangerous condition, which he is not employed to repair, but which he discovers in the course of making the repairs agreed upon and of which he realizes that his employer is unaware, may not be subject to the liability stated in this Section."

In our opinion the principles set forth in the Glisson case and those set forth in the Restatement are not inconsistent with the position which we take in connection with this opinion.

■■ We are not aware of a case precisely in point. We hold that where a dealer performs manufacturer's warranty repairs and in close proximity to the situs of the repairs there is a dangerous condition which the mechanic saw or in the exercise of ordinary care should have seen, there is either a duty to repair or a duty to warn. The presence of a dangerous situation and the matter of the use of ordinary care are, of course, fact problems. As to Hertz, the jury found negligence in the failure to discover and repair. The circumstantial evidence was such that the jury should have been given the opportunity to infer, or to reject the inference, that the offending Exhibit 62 clip had been installed prior to one of the various warranty repairs heretofore discussed. The jury should have been given the opportunity to conclude or to reject the conclusion that the empty L-shaped bracket was an indication of some type of improper installation which would lead a reasonable man trained in Chevrolet truck maintenance to investigate the routing of the speedometer cable and the dangers incident thereto. This is no greater than the burden which was cast upon Hertz under its contract and its duty as a lessor.

■ In our opinion the trial court was unduly restrictive in relation to the evidence offered by Hertz relative to finding clips similar to Exhibit 62 clips on Chevrolet and GMC trucks. The thrust of the ruling was that evidence had no probative value unless the clips were found upon a 1965 Chevrolet truck Model 60. We hold that these rulings were too restrictive in relation to the circumstantial evidence aspect of the proof. The absence of Exhibit 62 clips from the catalogue of Chevrolet parts was effectively used by Madison. This Court observes that there were no Exhibit E clips in the Chevrolet parts catalogue and at the same time the evidence is uncontroverted that the Exhibit E clips were Chevrolet parts factory installed.

This cause has been affirmed by this opinion as to all phases of the trial except as to the jury question of negligence on the part of Madison Chevrolet in failing to discover and correct the situation caused by the Exhibit 62 clip at the time of the warranty repairs, conditioned of course that the jury first find that the application of the Exhibit 62 clip preceded the warranty repairs or one of the warranty repairs made in the immediate vicinity of the place where the clip was installed upon the frame. As to this potential phase of the Madison Chevrolet concurrent tort liability, this case is reversed.

DONOFRIO, P. J., and CAMERON, J., concur.